IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| Liberty Bankers Life Insurance Company and Continental Life Insurance Company, | § § § § | |
| Plaintiffs/Counter-Plaintiffs | § § | Civil Action No. 3:16-cv-2417-N (Lead) Civil Action No. 3:18-cv-1846-N |
| v | § § | (Consolidated) |
| Walter H. Lenhard, III, | § § | |
| Defendant/Counter-Defendant | § | |

## JOINT PRETRIAL ORDER

Pursuant to the directions of the Court and the Court's Third Amended Scheduling Order, *D.E. 60*, and the Extension of Time granted with respect to same, *D.E. 84*, the parties submit this Joint final Pre-Trial Order.

1. **Summary of the Claims and Defenses of Each Party:**

   a. **Summary of the Claims of Liberty Bankers Life Insurance Company ("Liberty") and Continental Life Insurance Company ("Continental"):**

   This case involves fraud and breach of contract claims in connection with the sale of Continental to Liberty by Defendant Walter H. Lenhard, III ("Lenhard") and the post-closing "true up" of Continental's reserves called for under the sale documents.

   In short, while he ran Continental, Lenhard managed and controlled all of Continental's data and programmed proprietary software for its AS-400 computer system which was supposed to contain accurate information and programming so that reserves

1

could be accurately calculated.  Lenhard was also responsible for providing source data to the outside actuaries for them to determine the Closing Balance Sheet and for extracting data and reports for Liberty's due diligence process. Lenhard's role was significant in terms of making any changes to the system, extracting data from the system, running programs to pull reports from the system, preparing information that went to the accounting folks, interpreting data and the like.

Following due diligence in which Lenhard provided Liberty with information, Lenhard as Seller and Liberty as Purchaser entered into a Stock Purchase Agreement (the "SPA").   The purchase price was negotiated to be determined based upon certain adjustments that were calculated utilizing a "closing balance sheet" as that term is defined in the SPA.

Paragraphs 2.05 and 2.06 of the SPA contained material warranties and representations by Lenhard concerning Continental's reserves.  The SPA also set forth obligations of Continental, before Closing, including paragraph 5.01.   And, the SPA contained obligations that Lenhard agreed to abide by in Paragraph 8.01 and 11.02.

By letter dated April 30, 2015, Lenhard also agreed to a post-closing price adjustment based on variances in the Closing Balance Sheet pursuant to which Lenhard was to deliver to Liberty a review of the adequacy of its statutory reserves for the period as of March 31, 2015.  The SPA closed on April 30, 2015.

As part of the consideration for the SPA, the parties also agreed that at closing that Liberty would for itself and, upon acquisition, would cause Continental to execute a consulting agreement with Lenhard (the "Consulting Agreement").

2

After the sale closed, and Continental's then outside actuary Price Waterhouse Coopers declined the engagement, Lenhard hired and directed Alex Zeid, an independent actuary,  to evaluate Continental's statutory reserves in connection with the post-closing price adjustments. Because of Lenhard's unique knowledge regarding how to access Continental's data, including information regarding policies, policies in force and reserves, from the Software and AS400 System, Lenhard provided the underlying data that Zeid would need to conduct an accurate evaluation. Lenhard generated Continental's information from the software and AS-400 computer, which he then provided to Zeid for Zeid's evaluation and calculations for use and reliance by Plaintiffs.

In July 2015, having utilized the data and information provided by Lenhard, and based on the information provided by Lenhard, Zeid completed a statement of actuarial opinion as to Continental's statutory reserves as of March 31, 2015 which Lenhard provided to Plaintiffs for their reliance. In connection with Zeid's statement, Lenhard also provided Plaintiffs with a Statement Of Opinion On the Accuracy Of the In Force Records. Lenhard understood that Zeid's opinions would be utilized and relied upon by Plaintiffs in connection with the closing of the SPA and as to the true-up of reserves called for by the SPA. Lenhard also understood that Plaintiffs were going to rely upon the certification in connection with the SPA. As a result, there was an adjustment to the purchase price.

After acquisition, it was Liberty's plan that effective as of January 1, 2016, it would cause Continental's books to be transferred to the software accounting platforms utilized by Liberty. In the interim, it was contemplated that Continental, would continue to utilize the Software and AS400 System implemented by Lenhard. Based upon Lenhard's

3

representations regarding the Software and AS400 System and his knowledge and experience with that System and agreement to provide assistance with respect thereto under the Consulting Agreement, Liberty and Continental believed that was a reasonable approach.

As a result, in order to prepare year-end financial statements for submission to regulatory authorities in Pennsylvania for calendar year end 2015, Plaintiffs relied upon Lenhard to extract and provide data and information from the existing software systems and Lenhard performed these services under the terms and provisions of the Consulting Agreement referenced hereinabove. Zeid used this information to determine, among other things, the amount of reserves to be reported under Pennsylvania law. This work was completed during January and February of 2016. In connection with same, Lenhard, as Continental's consultant, signed a Certification of Inforce Records as of December 31, 2015, relied upon by Zeid, in which he affirmed that the listings and summaries of policies in force as of December 31, 2015 were accurate and complete (the "Lenhard Certification").

By January 2016, Liberty had begun migrating the Continental database to its own software platform. Lenhard was asked to, among other things, provide information as it related to preparing for a conversion of the database. As a consultant post-closing, Lenhard provided the policy data that Continental relied upon to submit year-end 2015 regulatory filings—even providing the certification of reserves initially relied upon by Continental and its actuaries. Lenhard provided similar data and information to assist Continental in migrating the data. This process was ongoing as 2015 year-end financials were being

completed.  However, as Liberty conducted a review and testing of the data, it uncovered substantial discrepancies in the amounts reflected for the statutorily applicable reserves from those contained in information provided by Lenhard.  Further investigation revealed that the inaccuracies were not a result of conversion errors but were the result of inaccuracies and omissions in the information and methodologies as utilized in Lenhard's historical data base from the Software and AS400 System. Indeed, it was during that integration process that Liberty discovered the data Lenhard was responsible for helping to implement was faulty—revealing that the financials that Lenhard had provided were materially false and inaccurate. Moreover, the data inaccuracies did not result from error. Rather, they resulted from Lenhard's systemic efforts to inflate Continentals' numbers to both Liberty and the Pennsylvania Insurance Commissioner in order to minimize regulatory scrutiny and to maximize the sale price. When Liberty corrected the information, it required a capital infusion of $1.8 million dollars and Liberty caused Continental to restate its financial statements and resubmit corrected reports to regulators.

When confronted, Lenhard made false and misleading statements about his prior submissions in email communications during late January and February of 2016.  It was during this process that Lenhard failed or refused to cooperate with representatives of Liberty and Continental and the independent actuary to determine and quantify the misrepresentations, errors, omissions and inaccuracies in the underlying information he provided.  Lenhard was thereafter terminated.

The Plaintiffs have satisfied all conditions precedent for bringing their claims.

Liberty asserts claims against Lenhard for fraud and fraudulent inducement based on misrepresentations within the SPA.  And, Liberty asserts claims for breach of Lenhard's contracts with Liberty including Paragraphs 2.05, 2.06, 4.05, 5.1, 8.01,  11.02 of the SPA and the April 30, 2015 post-closing letter from Lenhard.

Continental asserts claims against Lenhard for fraud and fraudulent inducement and for breach of paragraph 1 of the Consulting Agreement.[1]  Continental claims that it had the right to terminate the consulting agreement pursuant to paragraph 6a.

**b.**    **Summary of Liberty's Defenses:**

Lenhard sued Liberty for a declaratory judgment that he did not breach the SPA, that the prior valuations of the companies were properly calculated pursuant to the terms of the SPA; that the Post-Closing Agreement and Final Amount Agreement preclude Liberty from now claiming a different final amount from the stock purchase price and; for attorneys' fees and costs.  Liberty's defenses to this claim are that it is barred, in whole or in part because: 1) it is an improper mirror-image action seeking coercive relief; 2) of fraud and fraudulent inducement; 3) of prior material breach; 4) of failure of consideration; 5) of estoppel, laches and waiver; 6) of setoff or offset; 7) of  unjust enrichment and quantum meruit; 8) any injury Lenhard suffered was a result of its own conduct and/or its failure to comply with the terms of the various contracts; 9) Lenhard failed to give notice; and 10) Lenhard failed to state a claim or claims upon which relief may be granted.

---

[1] The Court dismissed Continental's claim for negligent misrepresentation and breach of fiduciary duty.  D.E. 58. Continental herein retains the right to appeal that Order.

### c.      Summary of Continental's Defenses:

Lenhard contends that Continental breached the Consulting Agreement. Continentals' defenses are that: 1) Lenhard was terminated "for cause" under that agreement; 2) Lenhard engaged in fraud and fraudulent inducement; 3) there was a prior material breach of the agreement by Lenhard; 4) there was a failure of consideration; 5) Lenhard's claim is barred by estoppel, laches and waiver; 6) Lenhard's claim is subject to setoff or offset; 7) Lenhard's claims is barred in whole or in part by unjust enrichment and quantum meruit; 8) any injury Lenhard suffered was a result of its own conduct and/or its failure to comply with the terms of the various contracts; 9) Lenhard failed to give notice; and 10) Lenhard failed to state a claim or claims upon which relief may be granted.

### d.      Summary of Mr. Lenhard's Claims:

This case arises out of Mr. Lenhard's sale of his ownership interest in Continental Life to Plaintiff Liberty. Continental Life is an insurance company that markets life, accident, and health insurance policies.  After extensive negotiations, during which Liberty Bankers requested a substantial amount of information with which it could conduct due diligence, the parties entered into a detailed Stock Purchase Agreement ("SPA") and Mr. Lenhard entered into a separate Consulting Agreement with Continental Life.  Prior to the sale, Continental Life conducted business in accordance with Pennsylvania law under the supervision of the Pennsylvania Department of Insurance. It retained an outside actuary to provide the necessary actuarial opinions and outside accountants to review and certify its financial statements. Continental Life conducted business and prepared its financial statements in the same way for over twenty years, subject only to changes in Pennsylvania

7

law and regulations. The manner in which it prepared its financial statements and calculated its reserves passed muster with the Insurance Department when the Department conducted periodic extensive, in-depth examinations of Continental Life.

Mr. Lenhard entered into good faith negotiations with Liberty Bankers for the sale of Continental Life. He provided all the information requested and, to the best of his knowledge, the information he provided was accurate and complete. He did not change the way Continental Life calculated reserves or prepared financial statements in the period leading up to the sale. Instead, he made his best efforts to work with Liberty Bankers to consummate the sale on a basis fair to all sides. The fully integrated SPA set forth representations Mr. Lenhard was making as to Continental Life (SPA at §2.05-2.06), disclaimed all representations not specifically set forth in the SPA (id. at §11.01), permitted a one-time price adjustment in accordance with a review to be completed by an independent actuary (id. at § 1.03), required Mr. Lenhard to submit certifications (id. at §9.01; 10.03(b)), and included a limitation of damages clause  (id. at 12.02(a)(i)).

The Consulting Agreement between Mr. Lenhard and Continental Life provides for Continental Life to pay Mr. Lenhard $28,000 a month for 36 months. The Consulting Agreement requires that "Consultant shall render the Services at such places and at such times as the Client and Consultant shall mutually agree."  The Consulting Agreement further states that Mr. Lenhard will perform the following services:

> Any and all consulting projects and duties mutually agreed upon by Client and Consultant with the Consultant's primary purpose of maintaining and growing the sales force of Continental Life Insurance Company ("CLIC"), by providing historical and institutional knowledge and assisting with any and all administrative issues.

The Consulting Agreement provides that "Consultant and Client agree that this Agreement may be terminated by the Client for 'Cause' within the period of this Agreement, subject to the other terms of this section."   The Consulting Agreement defines "for Cause" as: the termination of the Consultant's services by the Client by reason of (i) the conviction of the Consultant of a crime involving moral turpitude by a court of competent jurisdiction; (ii) the proven commission by the Consultant of an act of fraud upon the Client or Client's business interests; (iii) the willful and proven misappropriation of any funds or property of the Client by the Consultant; (iv) the willful, continued and unreasonable failure by the Consultant to perform duties assigned to him and agreed to by him; and (v) the willful and proven misappropriation of the Client's work product or confidential information without approval of the Client.

It was only after the sale closed, the price adjustment was made, and Liberty Bankers changed the way Continental Life calculated reserves, that Liberty Bankers became dissatisfied. It then decided that it should have negotiated a more favorable deal and created a litany of complaints against Mr. Lenhard.  Over nine months after closing the sale, Liberty Bankers demanded payment of approximately $1.8 million and terminated the Consulting Agreement, claiming that Mr. Lenhard had fraudulently misrepresented Continental Life's reserves and certain portions of the financial statements.   The alleged "systemic" errors that Liberty contends existed in Continental's system were specifically reviewed by the Pennsylvania Insurance Department, Continental's independent actuaries, and Liberty's chief actuary prior to the sale. Moreover, an independent actuary retained for this litigation

has opined that Continental held reserves that were more conservative than necessary in three ways that Liberty's actuaries ignore, and that the correct calculation under state Valuation Law is the aggregate reserve value, which was not appropriately analyzed by Plaintiff's experts leading to biased, unsubstantiated figures.

Cognizant of the uphill battle it has in attempting to establish fraud, Continental now tries to allege that Mr. Lenhard was terminated because he didn't respond to an email within two days, despite the fact that Mr. Lenhard performed all tasks he agreed to do as required by the Consulting Agreement. Continental Life made 9 of the 36 payments and, therefore, still owes Mr. Lenhard $756,000, plus interest.

Mr. Lenhard seeks a declaration from this Court that the valuations performed pursuant to the stock purchase agreement were proper and that Mr. Lenhard neither breached the terms of that agreement, nor has he committed any "act of fraud" in connection therewith or in connection with his consulting agreement with Continental Life. Mr. Lenhard also asserts claims for breach of contract arising from Continental Life's purported termination of the Consulting Agreement.

e.     **Summary of Lenhard's Defenses:**

Mr. Lenhard's defenses are: 1) the representations within the Stock Purchase Agreement were accurate; 2) Mr. Lenhard did not have actual knowledge of any mistakes in the financial statements as required by the Stock Purchase Agreement; 3) The reserves were computed in accordance with Pennsylvania Standard Valuation Law;  4) the Post Closing Agreement and Final Amount Agreement preclude Liberty Bankers from now

claiming a different final amount; 5) Liberty's claims are barred by failure to conduct due diligence; 6) Liberty's claim for breach of the Stock Purchase Agreement is subject to a limitation of liability provision within the Agreement; 7) Liberty has not established that any representation was made with knowledge that it was false, or made recklessly as a positive assertion without any knowledge of its truth.   In fact, Mr. Lenhard's representations were made with the knowledge that the company's reserves had been independently audited for years by independent actuaries, including PwC, that the company had regularly passed Pennsylvania Insurance Department exams, and that no one had ever told him that the methods he was using violated of any law, or accounting practice; 8) Mr. Lenhard did not breach the Consulting Agreement; 9) Continental suffered no damages for any alleged breach of the Consulting Agreement.

**2.** **Statement of Stipulated Facts**:

1.    Continental was formed in 1957 with its principal offices in Upper Darby, Pennsylvania.

2.    Walter H. Lenhard, III ("Lenhard") owned all of the issued and outstanding stock Security Providers, Inc. ("SPI") and Burlen Corporation ("Burlen").

3.    Burlen owned 100% of the outstanding stock of CLIC.

4.    Steve Phillips, based in Rydal, Pennsylvania, acted as the accountant for CLIC until the SPA.

5.    LBLIC is an Oklahoma Insurance Company with its principal office in Dallas, Texas.

6.      Beginning in 2007, Lenhard and LBLIC began discussing a potential sale of CLIC by Lenhard to LBLIC.  The broker on behalf of LBLIC was an individual named William Gibson ("Gibson").

7.      In October 2007, representatives of LBLIC met with Lenhard in Continental's offices in Upper Darby, Pennsylvania. As part of that meeting, Lenhard showed representatives of LBLIC, CLIC's system and how the AS400 worked.

8.      After the meeting, LBLIC hired Dan Ellis an actuary to value the business of CLIC.

9.      Beginning in 2013 and 2014, Lenhard and LBLIC exchanged draft letters of intent for the purchase of CLIC.

10.     On February 15, 2013 LBLIC sent to Lenhard a Letter of Intent.  Among other things, Lenhard's response stated that "The systems in place at Continental would allow you to add your existing home service business into our system at very little cost eliminating your expenses of administrating those policies.  We have recently upgraded our systems [the software and AS400 System] and are providing our agents a tablet to assist in their collections.  This allows them to send in their collections on the Internet.  It also supplies them with extensive policy information, which is updated each week.  We have given the demo of our system several times to your employees and I believe they will agree it is a very good system."

11.     All information provided by Lenhard to LBLIC and its representatives, Lenhard intended to LBLIC to receive and review in connection with negotiations to acquire CLIC.

12

12.     In July 2013 LBLIC sent to Lenhard a proposed letter of intent.

13.     On January 20, 2014 LBLIC sent Lenhard a proposed letter of intent.

14.     On or about February 25, 2014, Lenhard provided information to Gibson to depict Continental's profitability net of Lenhard related expenses.

15.      On March 1, 2014, Lenhard counter-offered in response via a letter sent to Gibson.

16.     On June 25, 2014, LBLIC and Lenhard entered into a letter of intent which specifically contemplated "due diligence by Liberty and that Liberty's agreement and approval was subject to the material accuracy and completeness of the information heretofore and hereafter furnished to Liberty and the completion of the satisfactory 'due diligence review' by representatives of Liberty.

17.     In July 2014, Lenhard came to Dallas, and for the first time met with LBLIC's President, Bradford Phillips ("Phillips"), and its Chief Actuary, David Vrla ("Vrla") and other representatives in the first and only face-to-face meeting between Lenhard and Liberty's principal (the "Dallas Meeting") concerning a potential sale by Lenhard of his companies, including CLIC, to LBLIC.

18.     Shortly after the Dallas Meeting, LBLIC requested further due diligence information from Lenhard.

19.     As set forth below, Lenhard provided source data to the outside actuaries for them to determine the Closing Balance Sheet.

20.     Lenhard extracted data and reports for LBLIC's due diligence process.

13

21.     Lenhard thereafter transmitted at least two boxes of due diligence information in response to LBLIC for it to review and rely on in further negotiations for the acquisition of CLIC.

22.     Lenhard understood that LBLIC would review that information in connection with negotiations for the acquisition of CLIC.

23.     Lenhard authorized CLIC's accountant, Steve Phillips, to confer with Phillips at LBLIC to discuss non-actuarial financial information of CLIC.

24.     Lenhard authorized CLIC's actuary from PWC, Anthony Cavalier, to confer with Phillips at LBLIC in connection with the ongoing negotiations for the purchase and sale of CLIC.

25.     The SPA generally provided that Liberty would acquire all of Lenhard's interest in Continental.

26.     The purchase price was negotiated to be determined based upon certain adjustments that were calculated utilizing a "closing balance sheet" as that term is defined in the SPA.

27.     In particular, adjustments were based upon any decrease in the statutory capital and surplus of Continental between the Balance Sheet Date, as that term is defined in the SPA, and December 31, 2013.

28.     The SPA also contained certain material warranties and representations. In particular, Paragraphs 2.05 and 2.06.  Paragraph 2.05 provided as follows:

**2.05. Financial Statements.** Schedule 2.05, to be delivered by Seller to Buyer in accordance with the provisions of Section 17.07 of this Agreement, contains the following SAP financial statements of the Insurance Companies:

      (a)    annual statements, for each of the years ending December 31, 2013 (the "2013 Financial Statement"), 2012 and 2011 prepared in accordance with SAP; and

      (b)    interim balance sheet, income statement and statement of changes in financial condition as of the end of the quarter immediately preceding the quarter in which this Agreement was executed, and for the fiscal period ending on such date, which fairly and accurately present the financial condition and operations of the Companies for the period which they purport to cover (the "Interim Financial Statement").

To the Seller's Actual Knowledge, each of the 2013 Financial Statement and the Interim Financial Statement (and the notes relating thereto, whether or not included therein) including, without limitation, each balance sheet and each of the statements of operations, capital and surplus account, and cash flow contained in the respective statement is a full and true statement (with no material omissions) of all the assets and liabilities (including all material contingent liabilities) and of the financial condition and affairs of the Insurance Companies as of the respective dates thereof and of the Insurance Companies' income and deductions therefrom for and during the respective periods covered thereby, and have been completed in accordance with the NAIC applicable instructions and accounting practices and procedures manuals except to the extent that: (1) state law may differ, or (2) state rules or regulations require differences in reporting not related to accounting practices and procedures.

To the Seller's Actual Knowledge, there are no liabilities, whether accrued, contingent, absolute, determined, determinable or otherwise (including without limitation, in any means of the Insurance Companies) other than (i) liabilities reflected or reserved against in the September 30, 2014 SAP financial statements, not heretofore discharged, (ii) policy holder benefits payable or other liabilities arising after September 30, 2014 in the ordinary course of business consistent with past practices and in amounts consistent with past practice, or (iii) liabilities disclosed on Schedule 2.05.

29.    Paragraph 2.06 of the SPA provided as follows:

2.06.  Reserves.  Except as disclosed on Schedule 2.06, to be delivered by Seller to Buyer in accordance with the provisions of Section 17.07 of this Agreement, all Reserves and other similar amounts with respect to insurance as established or reflected in the annual SAP financial statement of the Insurance Companies dated as of December 31, 2013 (including, without limitation, the reserves and amounts reflected respectively on lines 1 through 11 of page 3 of each of the annual financial statements of the Insurance Companies) were computed in accordance with commonly accepted actuarial standard consistently applied and are fairly stated in

accordance with the NAIC applicable instructions and accounting practices and procedures manuals except to the extent that, to the Seller's Actual Knowledge: (1) state law may differ, or (2) state rules or regulations require differences in reporting not related to accounting practices and procedures. The reserves shown in the 2013 Financial Statement of the Insurance Companies properly reflect all claims, assets and set-offs required in accordance with generally accepted statutory reporting under the laws applicable of the Insurance Companies. Since the date of the 2013 Financial Statement, there have been no transactions or events which would require an increase in any of the Insurance Companies' reserves or which require reserves for items not considered in said 2013 Financial Statement, except as identified in Schedule 2.06 and which would not have a Material Adverse Effect on the business of the Insurance Companies.

30.     Further, the SPA set forth certain obligations of the Companies, including Continental, before Closing, including paragraphs 4.05 and 5.01, which provided as follows:

> **4.05. Notice**. Seller will notify Buyer promptly in writing of, and contemporaneously will provide Buyer with true and complete copies of material information or documents relating to, any event, transaction, or circumstance occurring after the effective date of this Agreement, which, to Seller's Actual Knowledge, causes or will cause any agreement of Seller under this Agreement to be breached, or that renders or will render untrue any representation of Seller contained
>
> in this Agreement.

**5.01.  Conduct of Business.**  The Companies will conduct their business in the ordinary course and consistent with past practice (unless otherwise permitted or required under this Agreement).  Without limiting the generality of the foregoing:

(a)    The Companies will use commercially reasonable efforts to (i) preserve intact the Companies' present business organization, reputation, and policyholder relations; (ii) keep available the services of the Companies' present officers, directors, employees, agents, consultants, and other similar representatives (it being understood and agreed to by the parties hereto that the directors of the Companies, other than Continental Mutual, will terminate their positions as of the Closing Date); (iii) except as set forth in Schedule 5.01, maintain all material licenses, qualifications, and authorizations of the Companies to do business in each jurisdiction in which it is so licensed, qualified, or authorized (subject to any restrictions on such licenses, qualifications and authorizations); (iv) maintain in full force and effect all Contracts referred to in Section 2.10 hereof, (v) maintain all material assets and properties of the Companies in the working order and condition as the same exist on the date of this Agreement, ordinary wear and tear excepted, (vi) maintain and protect the confidential and proprietary nature of the Companies' policyholder lists, lists of the Companies' agents and producers, billing records and commission statements, marketing plans, lists of prospective customers or agents, and other materials relating to the Companies' sales and marketing practices in force, in a manner consistent with past practices; (vii) upon the reasonable request of Buyer, retrieve policyholder lists and copies thereof in the hands of any persons other than executive officers or employees of the Companies, and make no further distributions of any such lists, except as required in group billings and commission statements distributed in the ordinary course of business; and (viii) upon the reasonable request of Buyer, deliver to each of the officers, agents and employees of the Companies a written statement advising them of the proprietary and confidential nature of all of the information specified in subparagraph (a)(vii) of this Section;

(b)    The Companies will use commercially reasonable efforts to (i) maintain the books and records of the Companies in a form and manner that is consistent with the form and manner used by the Companies to maintain such books and records during the three (3) years prior to the Closing Date and (ii) will not permit a material change in the underwriting, investment, actuarial,

17

financial reporting, or accounting practices or policies of the Companies or in the assumptions underlying such practices or policies, or in the methods of calculating any bad debt, contingency, additional actuarial reserve or other reserves for financial reporting purposes or for other accounting purposes (including, without limitation, the practices, policies, assumptions, or methods relating to or affecting the determination of the Companies' investment income, valuation of the assets and liabilities of the Companies reserves or other similar amounts, or operating ratios with respect to expenses, losses, or lapses);

(c)     The Companies will use commercially reasonable efforts to: (i) properly prepare and duly and timely file the reports and tax returns required to be filed with any governmental or regulatory authorities with respect to the business, operations, or affairs of the Companies; and (ii) duly and fully pay all taxes indicated by such tax returns or otherwise levied or assessed upon the Companies or any of their assets and properties, and withhold or collect and pay to the proper taxing authorities or hold in separate bank accounts for such payment all taxes that the Companies are required to so withhold or collect and pay, unless such taxes are being contested in good faith and, if appropriate, reasonable reserves therefore have been established and reflected in the books and records of the Companies in accordance with SAP;

(d)     The Companies will cause all reserves and other similar amounts with respect to insurance contracts established or reflected in the books and records of the Companies to be (i) computed and reflected on a basis consistent with those reserves and other similar amounts and reserving methods followed by the Companies at December 31, 2013 and (ii) good, sufficient and adequate as of the Closing Date (under commonly accepted actuarial standards consistently applied and fairly stated in accordance with sound actuarial principles) to cover the total amount of all reasonably anticipated matured and unmatured benefits, dividends, losses, claims, expenses, and other liabilities of the Companies under all insurance contracts pursuant to which the Companies have or will have any liability (including, without limitation, any liability arising under or as a result of any reinsurance, coinsurance, or other similar contract); and

(e)     The Companies will use commercially reasonable efforts to comply, in all material respects, with all laws applicable to their respective business, operations, or affairs.

(f)     The Companies will not enter into any contract or, except as required by any contract disclosed in Schedule 2.10, engage in any transaction

with Seller or any of affiliates of the Companies or Seller.

31.    And, the SPA contained certain obligations that Lenhard agreed to abide by

in Paragraph 8.01 and 11.02 as follows:

> **8.01. Performance by Seller.**  Seller shall have performed, satisfied, and complied
> with all agreements, obligations and conditions required by this Agreement to be
> performed or complied with by it on or before the Closing Date.
>
> **11.02. Future Cooperation.**  After Closing, Seller and Buyer shall cooperate with
> each other by furnishing any additional information and executing and delivering any
> additional documents as may be reasonably requested by the other to further perfect
> or evidence the consummation or otherwise implement, any transaction contemplated
> by this Agreement, or to aid in the preparation of any regulatory filing, financial
> statement or tax return; provided, however, that any such additional documents must
> be reasonably satisfactory to each of the Parties and not impose upon either Party any
> material liability, risk, obligation, loss, cost or expense not contemplated by this
> Agreement.  In addition, to the extent that Buyer or the Companies reasonably
> request any information, work papers or other documents possessed by any
> independent accountant, auditor, tax return preparer, internal accountant or employee
> of Seller relating to or involving the Companies prior to the date of Closing, Seller
> shall either make such item available to Buyer and the Companies or cause the
> appropriate individual or independent entity to make such information (including
> copies thereof) available to the Companies and the Buyer at the Buyer's sole cost and
> expense.

32.    Also, as a consideration and condition of the execution of the SPA, the parties

agreed that at closing that Liberty would for itself and, upon acquisition, would cause

Continental to execute a consulting agreement with Lenhard which was conditioned on

closing the SPA.

33.    As set forth below, Lenhard also provided the source data to the outside

actuaries for them to determine the Closing Balance Sheet and for extracting data and

reports for Liberty's due diligence process.

34.     By letter from Lenhard dated April 30, 2015, the parties agreed to a post-closing price adjustment based upon variances in the Closing Balance Sheet.

35.     As part of this April 30, 2015 letter, Lenhard agreed to a post-closing price adjustment based on variances in the Closing Balance Sheet.  In connection therewith, Lenhard as Seller under the SPA was to deliver to Liberty a review of the adequacy of its statutory reserves for the period as of March 31, 2015, performed by PricewaterhouseCoopers, LLP ("PWC") or Alex Zeid.

36.     The closing of the SPA occurred on April 30, 2015.

37.     On or about May 4, 2015, Continental entered in a Consulting Agreement with Alex Zeid to conduct the calculation of reserves as of March 31, 2015.

38.     Lenhard was the President to CLIC as of March 31, 2015.

39.     The Consulting Agreement provided that Lenhard perform services as follows:

Consulting Services

> Agreement to Consult.  During the term of the Agreement, Consultant agrees to perform to the best of his ability the services, as set forth in subpart C of this paragraph 1 (the "Services"), for the Client, as its CEO, Bradford A. Phillips, or his designee may request.
>
> Place of Work.  Consultant shall render the Services at such places and at such times as the Client and Consultant shall mutually agree upon.
>
> Services. During the term of this Agreement, Consultant agrees to perform, and Client agrees to retain and pay Consultant for, the following services:

20

Any and all consulting projects and duties mutually agreed upon by Client and Consultant with the Consultant's primary purpose of maintaining and growing the sales force of Continental Life Insurance Company ("CLIC"), by providing historical and institutional knowledge and assisting with any and all administrative issues.

40.     The Consulting Agreement was for a three-year term.  But, it also provided that it was terminable with cause, as follows:

6.     Termination.

With Cause.  Consultant and Client agree that this Agreement may be terminated by the Client for "Cause" within the period of this Agreement, subject to the other terms of this section.   Such termination shall be effective upon delivery of written notice to Consultant of the Client's election to terminate this Agreement under this section.  The term "for Cause" shall mean the termination of the Consultant's services by the Client by reason of (i) the conviction of the Consultant of a crime involving moral turpitude by a court of competent jurisdiction; (ii) the proven commission by the Consultant of an act of fraud upon the Client or Client's business interests; (iii) the willful and proven misappropriation of any funds or property of the Client by the Consultant; (iv) the willful, continued and unreasonable failure by the Consultant to perform duties assigned to him and agreed to by him; and (v) the willful and proven misappropriation of the Client's work product or confidential information without approval of the Client.

**3.     Contested Issues of Fact:**

**A.     PLAINTIFFS' CONTESTED ISSUES OF FACT**

1.     In the late 1980's CLIC implemented a custom designed database (the Software and AS400 System) which allowed CLIC to use all of its existing basic programs on a new high machine.

2.     In the 1990's CLIC implemented the handheld computer collection system which used Telxon hardware.   Lenhard wrote the software that ran on the Telxon's operating system.

3.     Because of Y2K and the fact that IBM would no longer support Basic computer language, CLIC upgraded the AS400 by purchasing a new operating system and converting its programs to RPG.  Brian Lenhard (Lenhard's son) oversaw the rewriting of all of the existing programs to the new language.

4.     At the time of the rewrite, Lenhard was not involved.  However, in 2000 Brian Lenhard left the company and Lenhard took over the software programing and maintenance modifying some of the programs if required because of changes to CLIC business.

5.     As part of the AS400 system, CLIC had programs that computed the actuarial values.  With the help of a third-party company, DSS, Lenhard wrote many of the programs for the AS400 system.   The AS400 computer was tailored to the insurance business of Continental which became one of the main benefits of CLIC and added value to CLIC.

6.     Lenhard was the person most knowledgeable at CLIC to run new queries, program new routines, extract data that wasn't already set up as an extraction routine or make changes to the database or software apartment from the routine operations, including changing the way that it made calculations and/or printed out reports.

7.     While he ran CLIC, Lenhard was responsible for establishing CLIC's accounting and financial systems.

8.     Lenhard also programmed the AS400 software used for reserve calculations.

9.      Until year end December 2014, the firm of PriceWaterhouseCoopers, LLP ("PWC") acted as the outside actuary for CLIC.

10.     In July 2008, Lenhard engaged a P&C actuary to provide a report on the valuation of the mutual company.

11.     All information provided by Lenhard to LBLIC and its representatives, Lenhard intended to LBLIC to receive and review in connection with negotiations to acquire CLIC.  Lenhard intended that LBLIC and its representatives rely upon all the information about CLIC in connection with the negotiations to acquire CLIC.

12.     On or about February 25, 2014, Lenhard provided information to Gibson to depict Continental's profitability net of Lenhard related expenses.  Lenhard e-mailed that document to Gibson at his email address prior to closing. Lenhard intended that the information provided to Gibson on or about February 25, 2014 would be reviewed and relied upon by Liberty in connection with negotiations in Dallas.  This information, among others, evidenced information regarding policies, and premium revenue from policies, in force at Continental.   Lenhard transmitted the information with the intent that it be reviewed and relied upon by Liberty representatives in Dallas, Texas, with respect to a potential purchase of Lenhard's Companies, including Continental.

13.     On March 1, 2014, Lenhard counter-offered in response via a letter sent to Gibson.  Lenhard intended that his counter-offer of March 1, 2014 be delivered in Dallas, Texas to Brad Phillips for his review in Dallas.

14.     In July 2014, Lenhard came to Dallas, and for the first time met with LBLIC's President, Bradford Phillips ("Phillips"), and its Chief Actuary, David Vrla

23

("Vrla") and other representatives in the first and only face-to-face negotiations between Lenhard and Liberty's principal (the "Dallas Meeting") concerning a potential sale by Lenhard of his companies, including CLIC, to LBLIC.

15.    At the Dallas Meeting, among other things, the following occurred:

  a. Lenhard discussed Continental's financial information;
  b. there was discussion by Lenhard on the history of Continental, Lenhard's involvement in how he originally became involved with Continental and his purchase of Continental;
  c. Lenhard described how he ran Continental and its operations and Lenhard reviewed production, the agents and the list of agents that he had brought with him, the compensation structure, the types of products being sold, where they were sold, and the methods of collection;
  d. Lenhard represented that the software developed by him and his son was tailored to the insurance business of Continental and its affiliates;
  e. Lenhard represented that the software was leading cutting edge;
  f. that the software was utilized to calculate reserves; and
  g. Lenhard represented that the financial statements he provided to Liberty, which included Continental's reserves, were true, accurate and complete.

16.    Lenhard was responsible for providing the source data to the outside actuaries for them to determine the Closing Balance Sheet.

17.    Lenhard was responsible for extracting data and reports for LBLIC's due diligence process.

18.    Lenhard authorized CLIC's accountant, Steve Phillips, to confer with Phillips at LBLIC to discuss non-actuarial financial information of CLIC. Lenhard understood and anticipated that LBLIC would rely upon the information being conveyed with respect to the propose transaction by CLIC's accountant Steven Phillips to Brad Phillips of LBLIC.

19.    Lenhard authorized CLIC's actuary from PWC, Anthony Cavalier, to confer with Phillips at LBLIC in connection with the ongoing negotiations for the purchase and sale of CLIC. Lenhard understood and anticipated that LBLIC would rely upon the information being conveyed with respect to the propose transaction by CLIC's actuary from PWC, Anthony Cavalier, to Brad Phillips of LBLIC.

20.    In March 2015, Lenhard and Cavalier discovered a problem with the reserve run that had a new category of policies that showed up and Lenhard did not initially reserve them.  The problem was fixed by March 19, 2015.

21.    Lenhard had no face-to-face meetings with representatives of LBLIC regarding the reserve calculation issue in the first quarter of March 2015.

22.    On April 30, 2015, Lenhard as Seller and LBLIC as Purchaser entered into a Stock Purchase Agreement (the "SPA") effective as of December 2, 2014.

23.    While he ran Continental, Lenhard was the sole person responsible for establishing Continental's accounting and financial systems.   He implemented the Software and AS400 System and was the only person that could access that data.

24.    Lenhard was also responsible for providing the source data to the outside actuaries for them to determine the Closing Balance Sheet and for extracting data and reports for Liberty's due diligence process.

25.    Because of this unique historical knowledge, Liberty agreed to retain Lenhard as a consultant.

26.    The Consulting Agreement was Lenhard's idea and came at his request.

27.     In connection therewith, Lenhard as Seller under the SPA was to deliver to LBLIC a review of the adequacy of its statutory reserves for the period as of March 31, 2015.

28.     The only source of underlying information available to determine the statutory Reserves for Continental as of March 31, 2015 resided in electronic form in the AS400 computer system which utilized proprietary software developed by Lenhard.

29.     On April 30, 2015, Lenhard individually and CLIC entered into a Consulting Agreement.

30.     As part of the consulting agreement, Lenhard agreed to assist CLIC in any and all consulting projects and duties mutually agreed upon by Client and Consultant and with Consultant primary purpose of maintaining and growing the sales force of Continental, by providing historical and institutional knowledge and assisting with any and all administrative issues.

31.     After the execution of the consulting agreement, Lenhard was requested to and did provide consulting services to LBLIC or CLIC to facilitate is subsequent operations or business.

32.     Lenhard was requested to assist CLIC with respect to the calculation of reserves for the purposes of closing the transaction and also helping to calculate the reserves for year 2015 and the quarterlies before that.

33.     By April 27, 2015, Lenhard understood that in connection with the closing of the SPA that LBLIC was relying on the adequacy of the reserves on the balance sheet date.

34.     On or about April 27, 2015 PWC with the authorization of Lenhard provided to LBLIC an email statement  as to the adequacy of CLIC's reserves.

35.     However, PWC refused to calculate the reserves for the sale with LBLIC. As a result, Lenhard recommended Alex Zeid ("Zeid") to act as the actuary for the purposes of calculating the reserves as of March 31, 2015.

36.     After closing, in connection with the post-closing price adjustment referenced above, after PWC refused to participate, Lenhard hired Alex Zeid ("Zeid") an independent actuary to evaluate the statutory reserves of Continental for reliance by Plaintiffs.

37.     Both before and after closing, Lenhard, was the only person who knew how to access Continental's data, including information regarding policies, policies in force and reserves, from the Software and AS400 System.

38.     As Lenhard was the sole person that had historical knowledge or ability to extract information from the Software and AS400 System, his role was significant in terms of "making any changes to the system, extracting data from the system, running programs to pull reports from the system, preparing information that went to the accounting folks, interpreting data and the like."  Because that knowledge was unique to Lenhard, Lenhard agreed to provide the underlying data that Zeid would need to conduct an accurate evaluation.

39.     Lenhard was Zeid's project manager in connection with the initial Zeid evaluation and calculation of Continental's reserves as of March 31, 2015.

40.     Lenhard thereafter began providing Continental documents, which he generated from the Software and AS-400 System, for Zeid's evaluation and calculations for use and reliance by Plaintiffs.

41.     In connection with the with Zeid's certification, Lenhard provided Zeid with the current files for the MDO and life industrial business for the paid up active and ETI files.  Such information was provided in electronic form via email communications with Zeid.

42.     Lenhard personally gathered the information transmitted to Zeid.

43.     Lenhard built the files and attached them to emails to Zeid.

44.     In making his initial determination of reserves as of March 31, 2015, Zeid "relied upon listings and summaries of policies in force and other relevant data such as paid to dates and reinsurance ceded amounts prepared by Walter Lenhard, president of Continental Life Insurance Company, as certified in the attached statement."

45.     According to Zeid, he wasn't going to audit Lenhard's data.  Instead, he was to assume that the data Lenhard gave him was correct.

46.     Lenhard sent Zeid 6 groups of policies regarding reserves prior to March 31, 2015 so Zeid could calculate the reserves:  Industrial premium paying, industrial paid up, industrial ETI, MDO premium paying, MDO paid up and MDO ETI.  Lenhard himself gathered that information and built the policy data files.

47.     Lenhard's affirmation was material to Zeid providing his report.

48.     On July 14, 2015, having utilized the data and information provided by Lenhard, and based on that information, Zeid provided Liberty with a statement of actuarial

opinion as to Continental's statutory reserves as of March 31, 2015. Zeid's report specifically referenced that the source of the information upon which he relied and that his calculations were specifically contingent upon the certification of Lenhard.

49.     Lenhard understood that Zeid's opinions would be utilized and relied upon by Plaintiffs in connection with the closing of the SPA and as to the true-up of reserves called for by the SPA.

50.     In connection with Zeid's statement, Lenhard also provided Plaintiffs with a Statement Of Opinion On the Accuracy Of the In Force Records.  It provided, in part, as follows:

I, Walter Lenhard, President, Continental Life Insurance Company hereby affirm that the listings, and summaries of policies inforce as of March 31, 2015, relating to data prepared for and submitted to Alex Zeid in support of his actuarial opinion for Continental Life Insurance Company as of March 31, 2015 were prepared under my direction and, to the best of my knowledge and belief, are substantially accurate and complete.  I affirm that the data are the same as, or derived from, the records and other data which form the basis of the statement for the quarter ended March 31, 2015.

51.     Lenhard understood that Zeid's opinions would be utilized and relied upon in connection with the closing and the true-up called for in the SPA.

52.     Lenhard also understood that Plaintiffs were going to rely upon his statement of opinion on the accuracy of the in force records.

53.     Representatives of Liberty did not provide any information to Zeid for the purpose of his calculations and opinion and had no communications with him regarding his work prior to his delivery of his opinion.

54.     After acquisition, it was Liberty's plan that effective as of January 1, 2016, it would cause the books of the companies it acquired from Lenhard, including Continental, to be transferred to the software accounting platforms utilized by Liberty.  In the interim, it was contemplated that those companies, including Continental, would continue to utilize the Software and AS400 System implemented by Lenhard.

55.     Based upon Lenhard's representations regarding the Software and AS400 System and his knowledge and experience with that System and agreement to provide assistance with respect thereto under the Consulting Agreement, Liberty believed that was a reasonable approach.

56.     As a result, in order to prepare year-end financial statements for submission to regulatory authorities in Pennsylvania for calendar year end 2015, Plaintiffs relied upon Lenhard to extract and provide data and information from the existing software systems and Lenhard performed these services under the terms and provisions of the Consulting Agreement referenced hereinabove.  This information was in turn utilized by Zeid to determine, among other things, the amount of reserves to be reported under applicable Pennsylvania law.  This work was completed during January and February of 2016.

57.     In connection with same, Lenhard, as Continental's consultant, signed a Certification of Inforce Records as of December 31, 2015 in which he affirmed that the listings and summaries of policies in force as of December 31, 2015 were accurate and complete (the "Lenhard Certification").

58.     Toward the end of 2015, Liberty began the process of converting the in-force policy information kept and maintained on the AS400 computer system to its computer

system which utilized a third-party vendor software used throughout the insurance industry, known as Quiklife.

59.     By January 2016, Lenhard was assisting CLIC and the management in completing the year-end financial reporting for CLIC for calendar year 2015 pursuant to his Consulting Agreement with CLIC.

60.     The data ultimately converted was for year-end 2015.  No attempt has ever been made by LBLIC to convert the data as of March 31, 2015 into the Quiklife system.

61.     Lenhard was terminated by Continental "for cause" as defined in paragraph 6a of the Consulting Agreement.

62.     During the process of converting year-end 2015 data, numerous problems were discovered in the underlying information as processed by Lenhard vis-a-vis the AS400 computer and proprietary software that he provided to Zeid to underlie the calculations that he understood LBLIC was to rely on.

63.     During this process, Vrla specifically communicated with Lenhard to gain his assistance in the process of understanding and resolving the issues.

64.     Lenhard was provided detailed information regarding the nature of the errors and was specifically requested to provide underlying data, information and reports from the AS400 computer system about such issues and errors.

65.     On January 4, 2016 Zeid advised Lenhard that there was a difference in the inforce between September 30, 2015 and December 31, 2015.

66.     In early January 2016, Lenhard transmitted information to be utilized by CLIC and Zeid in calculating reserves for December 31, 2015.

31

67.    CLIC and Zeid utilized the information provided by Lenhard to calculate reserves as of December 31, 2015.

68.    Toward the end of January, Lenhard was requested to provide and provided additional information to be utilized to calculate reserves as of December 31, 2015.

69.    On or about January 29, 2016, Vrla on behalf of CLIC requested Lenhard to provide additional information to a listing outstanding actuarial items.

70.    Lenhard responded to the request for outstanding actuarial items by in part delivering to Zeid and by providing additional files and information on or about February 6th and 7th.

71.    On February 8, 2016 Vrla sent an email to Lenhard advising that they were not able to match the valuation output policy records with the new admin system policy records.

72.    On January 29, 2016 Vrla emails Lenhard advising of the files that are still outstanding.

73.    On February 5, 2016 Vrla requested runs on Chesapeake Policies from Lenhard. Such files were provided on February 6, 2016.

74.    On February 16, 2016 Vrla sent an email to Lenhard requesting that Lenhard review the deferred premium and provide additional information.

75.    On February 19, 2016 Vrla sent another email to Lenhard following-up on his request of February 16th.

76.    Lenhard finally responded to Vrla's request for February 16, 2016 on February 20, 2016.

77. On February 17, 2016 Cavalier emailed Lenhard regarding the CLIC Asset Adequacy memorandum and requested his permission to provide to Zeid.

78. On February 22, 2016 Zeid requested that Lenhard execute a Statement of Opinion on Accuracy of In Force Records. However, Lenhard advised that he was a consultant who prepared the data files for the December 31, 2015 statement and submitted those files to Alex Zeid for preparing the reserves and therefore could not affirm anything else.

79. On February 22, 2016 Vrla transmitted a revised Certification of Inforce Records for Lenhard signature.

80. On February 22, 2016 Alex Zeid submitted his Statement of Actuarial Opinion Reliance Letter for statutory reserves as of December 31, 2015.

81. On February 23, 2016 Lenhard sent an email to Howell regarding policies that were missing from the reserve file sent to Alex Zeid. He further advised that he used a "qry" to ask for all active policies yet many were missing.

82. On February 23, 2016 Vrla sent an email to Lenhard and Zeid regarding the 3,236 policy numbers that were not found in the Alex Zeid reserve valuation seriatim file and requesting additional information from Lenhard and Zeid regarding the missing files.

83. On February 24, 2016 Vrla requested that Lenhard check again to insure that the due and deferred premium run picked up all of the policies.

84. On February 24, 2016 Vrla inquired as to whether policy loans were being double counted impacting the loans on surplus/income.

85.    On February 24, 2016 Lenhard email requested by email that "his Qry program had second page of criteria which said not to include the policy if it had a reported reserve of 0".

86.    On February 24, 2016 a teleconference was held between Vrla, Zeid and Lenhard.

87.    On February 24, 2016 emailed advising that based upon the current reporting (having both an asset for a policy loan and a reduction in reserve liability for the same loan) would be double-counting.

88.    On February 24, 2016 Vrla emailed Lenhard that they needed to address the issue pertaining to the March 31, 2015 balance sheet as well.  No response was provided by Lenhard.

89.    On February 24, 2016 Vrla emailed Lenhard requesting confirmation and verification of information.

90.    On February 25, 2016 McCaul emails regarding the due and deferred premiums and requests information from Lenhard.

91.    Lenhard advised that he would check the following day.

92.    On February 25, 2016 Vrla emails Lenhard providing a listing of information needed that was still outstanding.

93.    On February 25, 2016 Lenhard advised that he will rerun the report and exclude the ETI.

94.    Also on February 25, 2016 Vrla sent an updated list of items and questions still pending response from Lenhard.

95.     On February 29, 2016 Vrla emailed Lenhard that they were still waiting on the Due and Deferred run without ETI policies, including seriatim, to balance. No response was provided by Lenhard.

96.     On March 1, 2016 Lenhard responded that he had "no ability to do the active due and deferred with a Seriatim listing."

97.     On March 7, 2016 Vrla emailed advising of the problems that had been identified with respect to the December 31, 2015 audit reserves. No response was made by Lenhard to the email.

98.     On March 9, 2016 emails were exchanged between Vrla and Zeid copying Lenhard regarding the problems that had been identified.  However, Lenhard provided no response.

99.     When he became non-communicative, he was terminated as a consultant in early March 2016.

100.    On March 30, 2016 Zeid provided a Statement of Actuarial Opinion Reliance Letter regarding the Statutory Reserves as of December 31, 2015.


101.    After the reserves were correctly calculated for year-end 2015, Vrla determined to investigate the reserve calculations performed by Zeid in the summer of 2015 to see if those calculations likewise had similar errors that were uncovered in the process of completing the year-end calculations.

102.    As a result, Vrla obtained from the AS400 computer system the Continental AS400 master file as of March 31, 2015.  Vrla then made changes or extracts from those files to adjust for the errors and omissions similar to those as uncovered with respect to the year-end calculations and forwarded those files and information to Zeid, requesting that Zeid redo his work from the summer of 2015.

103.    The information that Vrla provided to Zeid on April 21, 2016 included in an Excel graph that Vrla prepared for and forwarded to Zeid along with instructions to recalculate the reserves for Continental as of March 31, 2015 using the Master File.  The Graph depicted LW (Lapse Waiting) policies that were put by Vrla into either the ETI or Premium Paying buckets for the purpose of recalculating the reserves.

104.    When Lenhard represented to Liberty that "we put policies in arrears in ETI when computing the reserves" that was only half true and misleading.  Anyone, including Vrla, would correctly interpret that as putting the purple policies completely in the ETI bucket.  But in fact, many of these policies had policy loans which were NOT converted into ETI policies, as Lenhard had stated, in that the policy loan remained an asset on Continental's balance sheet. ETI policies should not have a policy loan asset.  So, Zeid in his initial Statement of Actuarial Opinion dated July 14, 2015 based on the information provided by Lenhard, and relied on by Liberty, when he "put the policies in ETI", they actually subtracted the policy loans from reserves.   This amounted to double counting amounting to an error of approximately $220,556.

105.    Likewise, Lenhard's statement that "we put policies in arrears in ETI when computing the reserves," was only half true and misleading because anyone, including

Vrla, would correctly interpret that as putting the purple policies completely in the ETI bucket.  But, instead, due and deferred premiums were still being held as an asset on these policies.  An ETI policy cannot be reserved as if premiums have ceased have due and/or deferred premiums.  This error amounted to roughly $515,155.

106.    There were also problems with the policies depicted on the Graph, and Lenhard's statement that "we put policies in arrears in ETI when computing the reserves." The first problem, pertaining to policy loans, amounted to an error pertaining to some of the policies of roughly $237,006.   The second problem, involving due and deferred premiums still being held as an asset, amounted to an error of roughly $515,155 policies.

107.    Further, Lenhard's statement that "we put policies in arrears in ETI when computing the reserves," also was misleading in that the policies were assumed to be in arrears, when in fact they were NOT.  This is the Grace Period error.  It is notable that reserving these policies as ETI only reduced the PP reserves by approximately 20%. This error amounted to roughly $225,693.

108.    Lenhard led LBLIC down the wrong path by saying "we put policies in arrears in ETI when computing the reserves".  If Lenhard's statement was true, there would have been no LW problems with Continental's initial Statement of Actuarial Opinion dated July 14, 2015, (based on data provided by Lenhard) which LBLIC relied on.

109.    Based on the corrected data and information provided by Vrla, Zeid recalculated the reserves as of March 31, 2015 and issued a new Statement of Actuarial Opinion dated July 7, 2016.  As a result, it was discovered that the information Lenhard

provided to Zeid from the Continental AS400 Computer and Software for the initial calculation of reserves as of March 31, 2015, among other things:

    a.    Misrepresented the number of policies and omitted 2,911 policies;

    b.    Did not include an entire in force policy;

    c.    Incorrectly classified 426 policy loans as extended term insurance policies ("ETI");

    d.    Included calculation errors;

    e.    Misrepresented 1,910 policies as ETI without policy loans that were still in their grace period and should have been classified as premium paying policies;

    f.    Overstated advanced premiums;

    g.    Double counted policy loans which showed up as both receivables on the assets side of the balance sheet and also used to reduce the ETI reserves;

    g.    Misrepresented policies as paid to date when they should have included information regarding date last paid.

110.    The reserves calculated based on the correct data from Liberty amounted to $20,646,495. The reserves based on the inaccurate information provided by Lenhard amounted to $18,820,057. The difference was $1,826,438. As a result, Liberty caused Continental to restate its financial statements and was compelled to infuse $1.8 million into Continental to avoid statutory insolvency.

111.    Plaintiffs' expert, Glen Tobleman, based on an independent reserve and valuation net premium calculation, a review of Zeid's actuarial opinions and a review of the Independent Auditor's Report for year-end 2015, among other things, concluded that Continental's originally reported statutory capital and surplus for the quarterly period

ending March 31, 2015 was overstated by approximately $1.715 million under statutory accounting principles.   There were two overarching issues responsible for most of the $1.715 million adjustment:   1) premium paying policies incorrectly treated as extended term ("ETI"); and 2) accounting treatment inconsistencies.

112.   The financial impact of these two overarching issues is addressed below in greater detail.

113.   Life insurance policies issued in the United States are subject to the Standard Nonforfeiture Law (SNFL) for Life Insurance. The SNFL provides guidance regarding the minimum cash surrender value for life insurance contracts.

114.   The life insurance contracts offered by Continental offer the policyholder the right to receive cash when he surrenders, although the default nonforfeiture option is extended term insurance. In other words, unless the policyholder requests a cash option, CLIC will provide ETI coverage to the policyholder.

115.   CLIC's life insurance contracts also provide the policyholder the ability to borrow against their policy cash value at a loan rate specified in the contract. If loan interest is not paid, the policy loan increases with interest.

116.   The policy loan is paid directly to the policyholder; it represents real dollars paid to the policyholder. If a policyholder does not pay due premiums by the end of the grace period, then, a) the policyholder has a receivable from the insurance company equal to the cash surrender value; and, b) the policyholder has a payable to the insurance company equal to the policy loan. In practice, the two are netted and the insurance company uses the

net cash value (cash value minus the loan) to calculate the net amount payable to the insured. Note that the loan is terminated under this arrangement.

117.    In the 3/31/2015 quarterly financial statement, CLIC appropriately deducted the policy loan from the cash value to determine the ETI nonforfeiture benefit due to policyholders whose coverage lapsed due (primarily) to non-payment of premium. However, CLIC continued to reflect the policy loan as an asset on these contracts.   It is improper to reduce the liability to reflect the policy loan and still post the loan as an asset.

118.    At March 31, 2015, CLIC originally reported policy loans in the amount of $1,339,211. After correcting for this accounting error, contract loans were restated to $1,118,655, reducing statutory capital and surplus by $220,556.

119.    There were in force policies ignored, classified as terminated by CLIC.

120.    There were over 2,800 inforce CLIC policies that were not reserved in the original 3/31/2015 valuation.

121.    The mean reserve calculated for these contracts was $111,140 at March 31, 2015.

122.    The net due and deferred premium adjustment for these contracts was $38,018, so the net reserve adjustment is $73,122.

123.    There were misclassified ETI policies with policy loans.

124.    The original CLIC reserve calculation treated some policies still in their grace period as if they were lapsed.

125.    In the absence of errors that will be outlined below, if a premium paying policy converts to ETI, there should be several adjustments: a) Due and deferred premium

40

– Will fall to zero because the policy is paid up; b) Policy loan – Netted against cash surrender value, drops to zero; c) Mean reserve – Converts from premium-paying reserve to a paid up ETI reserve.  426 policies were in their grace period and should have been accounted for as premium paying policies.

126.    There were three major accounting errors in the original 3/31/2015 valuation: 1) Due and deferred premiums were still counted; 2) Policy loans were still admitted; and 3) Although the policy loan was appropriately netted against the cash value, there was an error in the ETI reserve calculation that materially understated the correct reserve.

127.    When CLIC calculated the liabilities were calculated, they were handled as if the policy had lapsed. But on the asset side, the policies were treated as if they were premium paying. The methodology employed overstated the Company's capital and surplus under statutory accounting principles.

128.    CLIC's ETI calculation assumed that all ETI contracts represented one unit of coverage. The average size of the ETI contracts was closer to $8,000, so the reserve calculated was only 1/12th of what it should have been.

129.    Adjusting for the errors listed above, the net reserve adjustment is $285,205.

130.    In addition, policy loans were double-counted in the amount of $237,006. The total accounting error associated with these contracts is $522,211.

131.    CLIC contracts that had policy loans prior to converting to Extended Term Insurance had the same "coverage" issues as the policies mentioned above.

132.    An adjustment was made to determine the death benefit net of the policy loan, but the units of coverage was assumed to always equal one, thus materially understating the correct reserve.

133.    When a contract converts to extended term, the ETI death benefit is reduced by the amount of the policy loan.

134.    Because the units of coverage error for contracts that had a policy loan when they converted to ETI, the ETI reserve at 3/31/2015 increased from $25,255 to $214,588, an increase of $189,333.

135.    There are also net reserve adjustments if the contract does not have a policy loan. CLIC's ETI calculation used the correct number of units to calculate the ETI reserve. However, the contracts should have been reserved as premium paying policies. The adjustments are listed below:

1) ETI Reserve calculated by CLIC at 3/31/2015 $1,304,116

2) Premium paying reserve re-calculated at 3/31/2015 $1,602,569

3) Net due and deferred premium re-calculated at 3/31/2015 113,918

4) Net Reserve re-calculated at 3/31/2015 [(3) – (2)] $1,488,651

5) Adjustment to Net Reserve at 3/31/2015 [(4) – (1)] $184,535

136.    In the recalculation, the Date of Last Payment was used as the Paid To Date, resulting in the following adjustment at 3/31/2015: Adjustment to statutory mean reserve $97,776; Adjustment to net due and deferred premium $40,088; Adjustment to Net reserve $57,688.

137.    There were two major adjustments required to correct the net due and deferred premium asset. First, CLIC inappropriately carried a due and deferred premium asset on ETI policies. Secondly, CLIC overestimated the net valuation net premium by applying too high a percentage to the gross due and deferred premium. On a combined basis, these two items account for a downward revision of the net due and deferred premium by $520,510.

138.    Mean reserve errors – There were minor adjustments necessary to the mean reserves associated with the estimated valuation net premiums. The total impact was a minor reduction to the reserves equal to $18,461 to the benefit of the Seller.

139.    Advanced premium – The liability for premiums received in advance was reduced by $33,722 as part of the re-calculation. Note that this change benefits Lenhard.

140.    Whether Lenhard breached paragraphs 2.05, 2.06, 4.05, 5.01, 8.01 and/or 11.02 of the SPA as well as the post-closing obligations in the letter dated April 30, 2015.

141.    What sum of money, if paid now in cash, would fairly and reasonably compensate Liberty for its damages that resulted from Lenhard's failure to comply with the SPA?

142.    Whether Lenhard committed fraud against Liberty in connection with representations and warranties he made in the SPA?

143.    Whether Lenhard fraudulently induced Liberty into entering into the SPA by representations and warranties he made in the SPA?

144.    What sum of money, if paid now in cash, would fairly and reasonably compensate Liberty for its damages that resulted from such fraud?

43

145.    Whether there is clear and convincing evidence that the harm to Liberty caused by Lenhard's conduct resulted from fraud.

146.    Whether there is clear and convincing evidence that the harm to Liberty caused by Lenhard's conduct resulted from gross negligence.

147.    What sum of money, as a result of the fraud, should be assessed against Lenhard and awarded to Liberty as exemplary damages?

148.    Whether Lenhard breached paragraph 1 of his Consulting Agreement with Continental.

149.    What sum of money, if paid now in cash, would fairly and reasonably compensate Continental for its damages that resulted from Lenhard's failure to comply with the Consulting Agreement?

150.    Whether Lenhard committed fraud against Continental after he became its consultant.

151.    Whether Lenhard fraudulently induced Continental into entering into the Consulting Agreement.

152.    What sum of money, if paid now in cash, would fairly and reasonably compensate Continental for its damages that resulted from such fraud?

153.    What sum of money, if paid now in cash, would fairly and reasonably compensate Continental for its damages that resulted from Lenhard's fraudulent inducement?

154.    Whether there is clear and convincing evidence that the harm to Continental caused by Lenhard's conduct resulted from fraud.

155.    Whether there is clear and convincing evidence that the harm to Continental caused by Lenhard's conduct resulted from gross negligence.

156.    What sum of money, as a result of the fraud, should be assessed against Lenhard and awarded to Continental as exemplary damages?

157.    What sum of money, as a result of the fraudulent inducement, should be assessed against Lenhard and awarded to Continental as exemplary damages?

## B.    DEFENDANT'S CONTESTED ISSUES OF FACT

1.    Prior to the sale of Continental to Liberty, Liberty engaged in negotiations and due diligence for years.  Liberty and Mr. Lenhard began negotiations for the sale of Continental to Liberty beginning in 2007.   Liberty and Mr. Lenhard continued discussing the potential sale of Continental on occasion from 2008 through 2013.  Liberty retained its own actuary, Dan Ellis, shortly after meeting with Mr. Lenhard in October 2007.

2.    In 2014, when negotiations for the sale of Continental became more serious, Liberty performed due diligence on the sale: "We requested a number of documents.  We requested a meeting in Dallas.  We requested – we sent an extensive due diligence checklist.  And ultimately, Mr. Lenhard came to meet with us and delivered a – came to meet with us and delivered an initial set of due diligence documents to us…"

3.    Mr. Lenhard was given a full due diligence list at his October 2014 meeting with Liberty's representatives: Brad Phillips (President of Liberty Bankers), David Vrla (Liberty's chief actuary), and Mike Simard (head of marketing for Liberty's life products.) Mr. Lenhard provided financial statements at the October 2014 meeting; while Mr. Phillips

claims that Mr. Lenhard did not discuss the reserves, he does admit that information on the reserves was provided.

4.    David Vrla, Continental's chief actuary, testified that he did not look closely at the reserves calculations. On September 9, 2014, Mr. Vrla sent an e-mail to Brad Phillips stating that Tony Cavalier, the PriceWaterhouse Cooper actuary for Continental Life, told him "Reserves are adequate and calculated in accordance with the SVL [Standard Valuation Law]."  Mr. Vrla never reviewed any of the examination reports of Continental by the Pennsylvania Department of Insurance, nor could he identify anyone at Liberty who did.

5.    The Stock Purchase Agreement notes: "No representations are made by any party except as specifically set forth in this Agreement." (Id. at ¶11.01.)

6.    Mr. Zeid's statement of actuarial opinion on the statutory reserves of Continental Life Insurance Company as of March 31, 2015 calculated that Continental's reserves were $711,952 less than what they should have been.

7.    Alex Zeid calculated Continental's reserves "for the next couple quarters" without issue.  By letter dated August 5, 2015, Mr. Lenhard and Liberty Bankers agreed on the "Final Amount" for the purchase price in accordance with the Stock Purchase Agreement and Post Closing Agreement (the "Final Amount Agreement").

8.    On April 30, 2015, in accordance with Article 10 of the Stock Purchase Agreement, Mr. Lenhard and Continental Life entered into a consulting agreement ("Consulting Agreement").

9.     The Consulting Agreement provides that: "During the term of this Agreement Consultant [Mr. Lenhard] agrees to perform, and Client [Continental Life] agrees to retain and pay Consultant for, the following services: "Any and all consulting projects and duties mutually agreed upon by Client and Consultant…"

10.     The Consulting Agreement sets forth a three-year term commencing April 30, 2015.

11.     Under the terms of the Consulting Agreement, Continental must pay Mr. Lenhard a fee of $28,000 each month during the effective period.

12.     The crux of the disagreement as to how reserves were to be calculated for Continental is the manner in which Continental historically held reserves for a category of policies that Continental termed "Lapsed Waiting" or "LW."   According to Mr. Vrla, Liberty's chief actuary, "We realized that much of the problem significantly was the LW status policies."

13.     Continental historically treated policies that were in default because the policyholders had not paid premium in a special category it termed "Lapse Waiting".

14.      According to Mr. Vrla, who became aware of the Lapsed Waiting category during Liberty Bankers' due diligence into Continental: "in this market the policy owners frequently do not continue paying on a policy.  So they may pay double this month and nothing next month and half the next month and double – but what's important is that it accumulates to be what they owe.  They paid what they owe. . . So we accept that as – as, okay, that's not a problem."

15.     Mr. Vrla knew that the Pennsylvania Department of Insurance flagged Continental's use of LW status in its annual examination in 2005, and allowed Continental to continue using LW status.

16.     The Pennsylvania Insurance Department examinations did not note any errors in how Continental's reserves were calculated.

17.     Continental has been in business over 20 years, domiciled in Pennsylvania and thus subject to the insurance laws of that state and regulations promulgated and enforced by that State' Insurance Commissioner and Department.

18.     Continental's annual financial statements had been audited, without qualification, by qualified accounting firms while its actuarial reserves had been certified, without qualification, by qualified actuaries employed by what is now known as PricewaterhouseCoopers.

19.      During the time period prior to the acquisition, Continental was also subject to several routine periodic financial examinations by the Pennsylvania Insurance Department, who also reviewed all of Continental's statutory annual year-end financial statement filings, without finding any problems that would require restatement of any annual statement.

20.     Further, these annual financial statements were submitted to and accepted by the Pennsylvania Insurance Department without disclosures of "permitted practices" surrounding the calculation of reserves.

21.     Mr. Vrla testified that he had no reason to believe that Mr. Lenhard changed the data in the AS400 for the specific purpose of something to do with the transaction of the sale of Continental Life.

22.     Plaintiffs retained an actuarial expert, Glenn A. Tobleman, to opine on the amount it believes the statutory capital and surplus were overstated.

23.     In Continental's system, premium-paying policies were converted to ETI as of 11:59 pm on the last day of the grace period when reserves were calculated, because the policy lapsed at midnight.

24.     Mr. Tobleman contends that this is an error, because he assumes the only correct way to calculate policy reserves during the policy's grace period is to treat the policy as being actively in force.

25.     In contrast, Mr. Lenhard's actuarial expert, William Horbatt, opines that, although a policy in its grace period appears to be the same as a premium paying policy since the death benefit normally remains the same, it is not. For example, the cash surrender value during the grace period is normally based on the non-forfeiture benefit's cash surrender value rather than a premium-paying policy's cash surrender value.

26.     Mr. Horbatt opines that Continental's approach of using ETI reserves during the grace period is reasonable, and in fact is more accurate than the treatment Mr. Tobleman contends Continental was required to follow, because policies normally have a premium due date on the first day of each month and the valuation at month ends like March 31 are calculated using files up to date at the end of that day.

27.     Any policyholder paying their overdue premium after the company has closed for the day and the file has closed will have their policy fully lapsed because the payment would be received no earlier than the next day, after the grace period has expired.

28.     Mr. Tobleman also indicates that there was an error with Continental's administrative system's use of a Date Last Paid (DLP) entry as opposed to a Paid to Date. The only area where the paid to date is used is to determine whether the policy is an in-force, premium paying policy, a lapsed policy, or a policy in its grace period. Since Continental's practice was to assign a first of the month premium date, the month of the paid to date is the same as the month of the last premium paid date. In either case the policy is in force during this month, will enter its grace period at the beginning of the next month if no further premium is paid during this month, and will lapse at the end of the next month if no premium is paid before the end of the next month.  Accordingly, there is no monetary error related to Continental's system utilizing a "Date of Last Payment".

29.     Mr. Tobleman explained that this difference in how policies were characterized resulted in fewer policies being considered in force as of the date of the adjustment, thus an incorrect and lower calculation of the necessary reserves.    Mr. Tobleman does not identify what policies were allegedly missing or mischaracterized.

30.     Mr. Tobleman and Mr. Horbatt agree that with respect to statutory liabilities, "Continental reduced their liability by the amount of the policy loan but continued to carry the policy loan as an asset."  Mr. Tobleman and Mr. Horbatt agree that this is not an error with respect to the calculation of reserves, but an error to include deferred premiums and policy loans on extended term insurance policies as assets in the balance sheet.

31.     Continental's outside accountant, Steven Phillips, and Mr. Lenhard never discussed that if the loans were being used to reduce liability on reserves, they should not be carried as an asset.

32.     There is no evidence that Mr. Lenhard had actual knowledge that it was an error to carry the policy loans as an asset.

33.     According to Mr. Horbatt, auditors and appointed actuaries opine on company financials following the common sense concept that deficiencies in reserves for some policies may be offset by excesses in reserves for other policies as long as the total reserves equal or exceed the statutory minimum values in accordance with the SVL.

34.     Per Mr. Horbatt, when calculated in accordance with Pennsylvania Standard Valuation Law, there are three ways in which Continental historically used reserves that were much more conservative than necessary, which would serve as an offset for any areas where Continental used reserves that were allegedly deficient.

35.     For example, Continental frequently used lower discount rates than the interest rate permitted by Pennsylvania law, so its policy reserves were consistently higher than the legal minimum.

36.     In addition, Continental frequently used older mortality tables than was required, with higher early deaths, which generated higher policy reserves than the legal minimum.

37.     Finally, Continental used the "net level premium" methodology to calculate policy reserves, as opposed to the Pennsylvania approved "commissioners reserve valuation method", which generates lower policy reserves.  As a result of these built in,

over-conservative bases, Continental's premiums were higher than the legal minimum in over 62% of Continental's policies.   In contrast, the discount rate was less than the minimum in less than 3% of policies.  In the remaining policies, the discount rate was equal to the legal minimum.

38.     Mr. Tobleman did not recalculate reserves on Continental's entire portfolio of contracts in strict accordance with Pennsylvania's minimum policy reserve standards in order to conclude whether there was offsetting differences for any purported deficiencies in reserves such as these.  As a result, his opinions about the values of the reserves are misleading, biased, and inaccurate, and not calculated in accordance with Standard Valuation Law and the Stock Purchase Agreement.

39.     In the Termination Letter, Mr. Phillips falsely states that Mr. Lenhard committed an "act of fraud on the Company."  Per the Termination Letter, this statement was based upon two "independent" actuaries assessment of the reserves.

40.     In addition to purportedly terminating the Consulting Agreement, Continental Life stopped making the required monthly payments to Mr. Lenhard pursuant to that agreement, with the last payment being made in January of 2016.   At the time of termination, Continental owed Mr. Lenhard $756,000 in unpaid consulting fees.

## 4.     Contested Issues  of Law

### A.     Plaintiff's Contested Issues of Law

1.     Whether Lenhard's declaratory judgment is an impermissible mirror-image action seeking coercive relief.

2.      The meaning and effect of provisions of the SPA including in particular paragraphs 2.05, 2.06, 4.05, 5.01, 8.01, and 15.02 to the extent that they are not ambiguous.

3.      The meaning and effect of provisions of the Consulting Agreement in particular paragraphs 1 and 6a to the extent that they are not ambiguous.

4.      Whether, if both Lenhard and Liberty and/or Continental recover, Liberty or Continental is entitled to a right of offset or a right of setoff.

5.      That the SPA is governed by Pennsylvania law.

6.      Whether, under Pennsylvania law, the elements of a breach of contract are: 1) the existence of a contract; 2) a breach of the contract; and 3) resultant damages.[2]

7.      Whether Lenhard breached paragraphs 2.05, 2.06, 4.05, 5.01, 8.01 and 11.02 of the SPA as well as the post-closing obligations in the letter dated April 30, 2015.

8.      Whether Liberty is entitled to recover damages of $1,000,000.00 from Lenhard on Liberty's breach of contract claim.

9.      Whether Liberty is the prevailing party and is entitled to attorneys' fees under the SPA and is entitled to move for such fees in accordance with Fed. R. Civ. P. 54(d)(2).

10.     That Liberty's fraud and fraudulent inducement claims are governed by Texas law.[3]

11.     That the elements of common law fraud under Texas law are: (1) that a material representation was made; (2) the representation was false; (3) when the

---

[2] *See Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.,* 635 Pa. 427, 445, 137 A.3d 1247, 1258 (2016).
[3] See D.E. 58.

representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.[4]

12.     That, under Texas law, fraudulent inducement claims require plaintiff to prove a misrepresentation; that defendant knew the representation was false and intended to induce plaintiff to enter into the contract through that misrepresentation; that plaintiff actually relied on the misrepresentation in entering into the contract; and that plaintiff's reliance led to plaintiff to suffer an injury through entering into the contract.[5]

13.     Whether Lenhard committed fraud against Liberty in connection with representations and warranties he made in the SPA.

14.     Whether Lenhard fraudulently induced Liberty into entering into the SPA by representations and warranties he made in the SPA.

15.     Whether the sum of $280,000.00 if paid now in cash, would fairly and reasonably compensate Liberty for its damages that resulted from such fraud.

16.     Whether "Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

17.     Whether there is clear and convincing evidence that the harm to Liberty caused by Lenhard's conduct resulted from fraud.

---

[4] *Saenz v. Gomez*, 899 F.3d 384, 391 (5th Cir. 2018).
[5] *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 277 (5th Cir. 2012).

18.     Whether there is clear and convincing evidence that the harm to Liberty caused by Lenhard's conduct resulted from gross negligence.

19.     Whether gross negligence means an act or omission:  (a) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (b) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.[6]

20.     Whether as a result of the fraud, exemplary damages should be assessed against Lenhard and awarded to Liberty.

21.     That the Consulting Agreement is governed by Florida law.

22.     Whether, under Florida law, breach of contract requires proof of 1) a valid contract; 2) a material breach; and 3) damages.[7]

23.     Whether Lenhard breached paragraph 1 of his Consulting Agreement with Continental.

24.     Whether the sum of $1.715 million if paid now in cash, would fairly and reasonably compensate Continental for its damages that resulted from Lenhard's failure to comply with the Consulting Agreement.

---

[6] Tex. Civ. Prac. & Rem. Code Ann. § 41.001.

[7] *Friedman v. New York Life Ins. Co.,* 985 So.2d 56, 58 (Fla. 4th DCA 2008).

25. Whether Lenhard committed fraud against Continental after he became its consultant.

26. Whether Lenhard fraudulently induced Continental into entering into the Consulting Agreement.

27. Whether the sum of $1.715 million if paid now in cash, would fairly and reasonably compensate Continental for its damages that resulted from such fraud.

28. Whether the sum of $1.715 million if paid now in cash, would fairly and reasonably compensate Continental for its damages that resulted from Lenhard's fraudulent inducement.

29. Whether there is clear and convincing evidence that the harm to Continental caused by Lenhard's conduct resulted from fraud.

30. Whether there is clear and convincing evidence that the harm to Continental caused by Lenhard's conduct resulted from gross negligence.

31. Whether as a result of the fraud, damages should be assessed against Lenhard and awarded to Continental as exemplary damages.

32. Whether as a result of the fraudulent inducement, damages should be assessed against Lenhard and awarded to Continental as exemplary damages.

**B.** **Defendant's Contested Issues of Law:**

1. Whether in the Stock Purchase Agreement Mr. Lenhard did not promise that the reserves or the balance sheet of the company was perfect. To the contrary, with respect to reserves, Lenhard represented that the reserves "were computed in accordance with commonly accepted actuarial standards consistently applied and are fairly stated in

accordance with the NAIC applicable instructions and accounting practices and procedures manuals except to the extent that, to the Seller's Actual Knowledge: (1) state law may differ, or (2) state rules or regulations require differences in reporting not related to accounting practices and procedures."

2.   Whether Continental's treatment of policies in the grace period was more reasonable than the approach suggested by Mr. Tobleman, and there is no requirement to treat policies in the grace period as Mr. Tobleman believes.

3.   Whether Liberty has established that Continental's historical treatment of policies in the grace period makes Mr. Lenhard's representation relating to reserves within the Stock Purchase Agreement false.

4.   Whether under Pennsylvania's life insurance Standard Valuation Law (SVL), PA Title 40, Part IV, Chapter 71, Sections 7120(a) and 7121(b), each life insurance company is required to hold aggregate policy reserves no lower than those calculated using its published standards.

5.   Whether the question under Pennsylvania law is not whether any one particular policy reserve is deficient as compared to published standards, but whether the aggregate policy reserves are lower than published standards.

6.   Whether Mr. Tobleman failure to recalculate reserves on Continental's entire portfolio of contracts in strict accordance with Pennsylvania's minimum policy reserve standards in order to conclude whether there was offsetting differences for any purported deficiencies in reserves means that Liberty cannot establish a deficiency under Pennsylvania law.

7. Whether Continental's treatment of policy loans relates to Mr. Lenhard's representation with respect to financial statements, not reserves.

8. Whether the Post-Closing Agreement and Final Amount Agreement preclude Liberty Bankers from now claiming a different final amount of the stock purchase price.

9. Whether Mr. Lenhard's liability for that breach is limited by the Stock Purchase Agreement's provision 12.03, to $900,000.

10. Whether Liberty's fraud and fraudulent inducement claims are barred by the Stock Purchase Agreement's provision that: "No representations are made by any party except as specifically set forth in this Agreement." (Id. at ¶11.0)

11. Whether Liberty has established that any representation within the Stock Purchase Agreement was false.

12. Whether Liberty has established that any representation was made with knowledge that it was false, or made recklessly as a positive assertion without any knowledge of its truth in light of the fact that Mr. Lenhard's representations were made with the knowledge that the company's reserves had been independently audited for years by independent actuaries, including PwC, that the company had regularly passed Pennsylvania Insurance Department exams, and that no one had ever told him that the methods he was using violated of any law, or accounting practice.

13. Whether Liberty's claims are barred by Liberty's common law obligation during the lengthy due diligence process to analyze the reserve information which was provided to it.

14.      Whether the Consulting Agreement at issue here was entered into by Continental and Mr. Lenhard only.

15. Whether under the Consulting Agreement Mr. Lenhard only had to perform "projects and duties mutually agreed upon" by Mr. Lenhard and Continental.

16.   Whether Continental suffered any damages as a result of any alleged breach of the Consulting Agreement.

17.      Whether, by terminating the Consulting Agreement without a legitimate basis, Continental Life breached that agreement and owes Mr. Lenhard $756,000 in unpaid consulting fees, plus interests and costs.

**5.    <u>Estimate of Trial Length</u>:**

Plaintiff estimates the trial will take five days. Defendant estimates the trial will take five to seven days.

**6.    <u>List of Additional Matters that Might Aid in the Case Disposition</u>:**

a.   Plaintiffs did not request a jury trial on their claims.  However, Lenhard did request a jury on his claims.  Accordingly, the parties request that the Court determine the manner in which the trial will be conducted.  The Plaintiffs suggest that the Court hold one trial with the Court determining its claims and the declaratory judgment claim brought by the Defendant and that the jury determine the Defendants' claim and affirmative defenses to that claim.

b.   Plaintiffs' Motion to Exclude the Testimony and Report of Defendant's Expert, William R. Horbatt and Request for Expedited Consideration, D.E. 63;

c.   Defendant's Motion to Exclude Testimony of Plaintiffs' Experts, *D.E. 65*;

d.   Defendant's Motion for Partial Summary Judgment, *D.E.* 67.

Respectfully submitted:

/s/ Dennis M. Holmgren
Mitchell Madden
State Bar No. 12789350
mmadden@hjmmlegal.com;
skinney@hjmmlegal.com
Dennis M. Holmgren
State Bar No. 24036799
dennis@hjmmlegal.com

**HOLMGREN JOHNSON:
MITCHELL MADDEN, LLP**
13800 Montfort Dr., Suite 160
Dallas, Texas  75240
Telephone:  972-484-7780
Facsimile:  972-484-7743

**ATTORNEYS FOR PLAINTIFFS**

*/s/ J. James Cooper*
J. James Cooper
T.X. I.D. No. 04780010
REED SMITH LLP
811 Main Street
Suite 1700
Houston, Texas 77002
Telephone: 713.469.3879
Facsimile: 713.469.3899
jcooper@reedsmith.com

**ATTORNEY FOR DEFENDANT**

Signed this ___ day of _____, 2019.


_____
Judge David Godbey

60